IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

DANIEL MANCINA,

Case No.:

     Plaintiff,

v.

RAINBOW SANDALS, INC.,

     Defendant.

---

William R. Frush (P87016)
F&S LAW, PLLC
Attorney for Plaintiff
77 Monroe Center St NW
Suite 600 - #1028
Grand Rapids, MI 49503
wfrush@fslawpllc.com
(248) 675-9192

---

## COMPLAINT

NOW COMES Plaintiff DANIEL MANCINA ("Plaintiff"), by and through his attorney, F&S LAW, PLLC, and hereby states his Complaint against Defendant RAINBOW SANDALS, INC., (hereinafter "Defendant") as follows:

## NATURE OF ACTION

This is an action for unlawful disability discrimination in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189, 28 C.F.R. Part 36, and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL 37.1101 et seq. Plaintiff seeks remedies under federal and

Michigan law for Defendant's failure to make its website accessible to individuals with disabilities. Plaintiff requests injunctive relief, compensatory damages, costs, and litigation expenses (including attorney's fees), as well as any other relief this Court deems fair and just.

### PARTIES

1.      Plaintiff DANIEL MANCINA ("Plaintiff") is a natural person and resident of Livingston County in the State of Michigan.

2.      Plaintiff has a determinable physical impairment that substantially limits one or more major life activities, i.e., the major life activity of seeing, due to Plaintiff's blindness. Plaintiff thus qualifies as a member of a protected class of individuals under the PWDCRA, MCL 37.1103(d).

3.      Plaintiff is also a member of a protected class of individuals under the ADA pursuant to 42 U.S.C. § 12102(1)-(2), and 28 C.F.R. §§ 36.101 et seq.

4.      As a result of his disability, Plaintiff relies on screen-reading software and other assistive technologies/software to access digital content, including websites and mobile applications, and obtain goods and services on equal terms with the non-disabled public.

5.      Plaintiff uses a computer program called VoiceOver to utilize the internet. VoiceOver is a built-in screen reader on macOS that provides auditory

F&S Law

descriptions of on-screen elements, permitting Plaintiff to navigate and interact with his computer (and the internet) using keyboard commands and spoken feedback.

6.     Defendant is a foreign for-profit corporation incorporated in the State of California with a principal place of business located at 900 Calle Negocio, San Clemente, CA 92673.

7.     Defendant's registered agent is Shannon L. Ruiz.

8.     Defendant is an American manufacturer and retailer of footwear, specializing in men's and women's leather, hemp, and rubber flip-flops.

9.     At all relevant times, Defendant owned, maintained, operated and/or controlled the following website related to its places of business: www.rainbowsandals.com (hereinafter "Website" or "the Website"). On the Website, Defendant advertises its products, promotes its brand, and facilitates online direct-to-consumer purchasing of Defendant's footwear products.

10.    Defendant's products are extended, offered, and sold to the Michigan public in numerous places of public accommodation, including but not limited to sporting goods stores, department stores, specialty retailers, and other various retail establishments throughout the State of Michigan.

11.    By manufacturing, distributing, and/or marketing its products for sale in places of public accommodation, Defendant directly participates in and benefits

from the privileges, advantages, and accommodations offered by the same places of public accommodation.

12.     The Website enables customers to research Defendant's footwear products and other inventory; compare product specifications and pricing, view product features and availability, read customer reviews, and access warranty information. Therefore, Defendant's Website is sufficiently connected to places of public accommodation such that there is a nexus between Defendant's Website and the physical places of business in which Defendant's goods are sold.

13.     Defendant's Website is an integral extension of Defendant's business operations and includes a "Store Locator" feature that allows customers to search for retail locations where Defendant's products are sold. The Store Locator directly connects the Website to the physical places of public accommodation where Defendant's goods are extended, offered, and sold, further demonstrating the substantial nexus between Defendant's online platform and brick-and-mortar sales establishments.

14.     The Website serves as the principal gateway to the goods that Defendant extends, offers, and sells at and through other places of public accommodation and is itself an intangible privilege, advantage, and service connected to the same facilities. Defendant's Website functions as the primary means by which prospective customers can discover where Defendant's products are sold,

4

research product specifications, access warranty information, and directly purchase Defendant's products online for direct-to-consumer delivery.

15.     By operating the Website as the primary online presence for its products and by distributing its goods through retail establishments that are indisputably places of public accommodation, Defendant is subject to and bound by the accessibility requirements mandated under the PWDCRA because it is a business whose goods, services, facilities, privileges, advantages, and/or accommodations are extended, offered, sold, or otherwise made available to the general public. MCL 37.1301(a).

16.     Defendant's Website is thus also a place of public accommodation under the PWDCRA, MCL 37.1301(a).

17.     By operating the Website as the primary online presence for its products and by distributing its goods through retail establishments that are indisputably places of public accommodation, Defendant is subject to and bound by the accessibility requirements mandated under Title III of the ADA, because Defendant's operations affect commerce in "a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment[.]" 42 U.S.C. § 12181(7)(E).

18.     Defendant has voluntarily entered the stream of commerce, places its branded products in places of public accommodation, and operates the Website as

the primary digital interface for consumers to access information about and purchase those products.

19.     Defendant cannot insulate itself from Title III's accessibility requirements by claiming it does not own or directly operate the retail premises where its products are sold. Title III's requirements extend to all aspects of Defendant's commercial operations that affect access to places of public accommodation, including the digital gateway through which consumers discover and purchase Defendant's goods.

20.     Defendant's Website is thus a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7)(E).

## **JURISDICTION AND VENUE**

21.     Plaintiff incorporates by reference paragraphs 1 through 20 as if fully stated herein.

22.     This Court has original jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. § 1331(a): "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

23.     This Court has supplemental jurisdiction over Plaintiff's PWDCRA claims pursuant to 28 U.S.C. § 1367 because they are so related to Plaintiff's ADA claims that they form part of the same case or controversy.

24.     Venue is proper in the United States District Court for the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to this claim occurred. Plaintiff accessed Defendant's Website from his residence in Michigan, and Defendant conducts substantial business in Michigan through the sale of its products at retail establishments throughout the state.

## FACTUAL BACKGROUND

25.     Plaintiff incorporates by reference paragraphs 1 through 24 as if fully stated herein.

26.     On February 10, 2026, Plaintiff visited Defendant's Website to browse and purchase a pair of Defendant's unique sandals for himself.

27.     Plaintiff encountered several accessibility errors present on Defendant's Website that prevented Plaintiff from being able to appropriately navigate, use, or complete an order on Defendant's Website.

28.     Defendant's Website presents visitors with a pop-up dialog window immediately upon loading. For sighted users, a pop-up dialog is a familiar and manageable experience: it appears in the center of the screen, its contents are visible, and the user can read and respond to it before dismissing it and continuing. The experience is brief and linear.

F&S Law

29.     For a blind user navigating by screen reader, a pop-up dialog requires careful programming to function correctly. When a dialog opens, the screen reader's focus must be directed into the dialog so the user can read and interact with its contents. When the dialog is dismissed, focus must be returned to a logical and predictable location, typically the element that triggered the dialog or the top of the main content area, so the user can continue navigating from a known position.

30.     When Plaintiff visited Defendant's Website, he was immediately confronted by a pop-up dialog upon the page loading. The dialog's sudden appearance was disorienting: Plaintiff's screen reader did not clearly orient him to the dialog's purpose or contents in a way that allowed him to understand what he was encountering or respond to it efficiently. After Plaintiff closed the dialog, his screen reader's focus was deposited not at the top of the page, nor at the point where navigation had begun, but at the bottom of the page. Plaintiff found himself, without warning or explanation, at the end of the site's content rather than its beginning.

31.     This occurred because Defendant's dialog was programmed without proper focus management. A properly coded dialog captures focus when it opens, announces itself to the user's screen reader as a dialog, presents its contents in a logical order, and—when closed—returns focus to a predictable location that allows the user to resume navigation without confusion. Defendant's dialog did none of this upon dismissal. Instead, it deposited Plaintiff's cursor at the bottom of the page: the

F&S Law

functional equivalent of opening a door for a visitor, then placing them at the back of the building before they have taken a single step.

32.      The practical consequence for Plaintiff was immediate and compound. He had not yet begun to browse Defendant's Website when he was forced to re-orient himself from an unexpected position at the page's bottom, navigating upward through content he had not yet encountered to reach the starting point that any sighted visitor occupied from the moment the page loaded. The pop-up that Defendant placed on its Website to greet customers became, for Plaintiff, the first of several involuntary displacements that defined his entire visit.

33.      The failure described above violates a foundational requirement of the Web Content Accessibility Guidelines ("WCAG") at their most basic level of compliance. When the focus order of a webpage changes—as it does when a dialog opens and is dismissed—keyboard focus must move in a sequence that is logical, predictable, and consistent with the page's structure. WCAG 2.1 Success Criterion 2.4.3 mandates that where navigation sequences affect meaning or operation, focusable components must receive focus in a logical order. Defendant's dialog deposited focus at an arbitrary and unexpected location bearing no relationship to where Plaintiff began or where he needed to be. That is a Level A requirement, the most fundamental tier of accessibility, representing the minimum below which a

F&S Law

website is considered unusable for certain users. Plaintiff encountered this failure before he could do anything else on Defendant's Website.

34.    Websites commonly contain navigation menus, headers, promotional banners, and other blocks of content that appear at the top of every page before the page's main substance begins. For a sighted user, these elements are easily bypassed: the eye moves past them to the content below without effort or conscious thought. For a blind user navigating by screen reader, every element on the page is encountered in sequence. Without a mechanism to skip past large blocks of repeated navigational content, a blind user must listen to and move through those elements in their entirety every time they load a new page, regardless of whether they have already encountered them.

35.    The standard solution to this problem is a skip link: a navigational control, typically the first interactive element on the page, that when activated moves the user's screen reader focus directly to the page's main content, bypassing the intervening navigational blocks. For a skip link to function correctly, two things must be true: the link must be reachable by keyboard, and when activated, it must actually move focus to the intended destination.

36.    Defendant's Website includes a control labeled "Skip to Content." Plaintiff located this control near the top of the page and activated it. The control did not work. After activation, Plaintiff's screen reader focus did not advance to the

page's main content. It remained where it was. The Skip to Content button announced itself as a mechanism for bypassing Defendant's navigational content; it did not perform that function.

37.     This occurred because the skip link was programmed without a functional destination. A properly coded skip link points to a target on the page, typically the opening element of the main content area, and when activated, moves focus there immediately. Defendant's skip link either points to a destination that does not exist or is otherwise coded in a way that prevents it from completing the navigation it promises. The result is a control that performs nothing while representing to the user that it has performed something. For a blind user, a non-functional skip link is not merely unhelpful. It is actively misleading: it invites reliance and then delivers nothing.

38.     The practical consequence for Plaintiff was significant. Instead of bypassing Defendant's navigational content as the skip link promised, Plaintiff was required to navigate through the entire structure of the page manually, element by element, before reaching any of the product content he came to access. Every page visit carried this tax. The skip link that Defendant placed on its Website to assist users like Plaintiff existed as form without function.

39.     This failure violates WCAG 2.1 Success Criterion 2.4.1, a Level A requirement, which mandates that webpages containing blocks of content that are

repeated across pages must provide a mechanism allowing users to bypass those blocks. A skip link that does not skip satisfies neither the letter nor the purpose of this requirement. Defendant's Website provides the appearance of compliance while denying its benefit entirely.

40.     When a customer searches for a product on Defendant's Website, the results page displays two categories of content: a set of filters allowing the customer to narrow results by attributes such as size, color, and price, and the search results themselves. For a sighted user, these elements appear simultaneously on screen. The sighted user takes in the page at a glance, decides whether to engage the filters or proceed directly to the results, and acts accordingly. The choice of where to direct attention is the user's to make.

41.     For Plaintiff, navigating by screen reader, that choice was not available. Defendant's Website is structured such that the filter panel appears before the search results in the order that screen-reading software reads the page. Because Plaintiff navigates sequentially, moving through elements one at a time as his screen reader announces them, he was required to pass through the filter panel in its entirety before his screen reader reached the first search result. He could not glance past the filters to the products; he had to move through the filters to get there.

42.     Compounding this burden, the filter options Plaintiff encountered were not clearly marked. Rather than presenting labeled controls whose purpose was

F&S Law

immediately apparent from what his screen reader announced, Plaintiff encountered filter elements that did not communicate their function or content in a way he could readily understand and act upon. A properly coded filter panel presents each filter category with a clear, descriptive label: "Size," "Color," "Price Range," so that a blind user can identify what each control does, decide whether it is relevant to their search, and either engage it or move past it efficiently. Defendant's filters did not provide this.

43.     After Plaintiff completed the forced traversal of the filter panel, the Website did not advance his focus to the first search result. Instead, Plaintiff's screen reader was directed to the very bottom of the page. Rather than arriving at the product listings he had worked to reach, Plaintiff found himself deposited past them entirely, at the end of the page's content rather than its beginning. The sequence of navigation that Defendant's Website imposed on Plaintiff, through an unlabeled filter panel, past the products he was seeking, to the bottom of the page, bore no logical relationship to the task he was attempting to complete.

44.     This occurred because of two compounding failures in how Defendant's Website was built. First, the filter panel lacked the structural markup necessary to communicate its organization and contents to assistive technology. A properly structured filter panel conveys to a screen reader not just that interactive elements are present, but what those elements are, what they control, and how they relate to

one another. Without that structure, the filter panel becomes a sequence of unmarked controls that a blind user must navigate blindly. Second, the navigation sequence following the filter panel deposited Plaintiff at an unrelated location, the page's bottom, rather than advancing him logically to the main content the filter panel precedes. These failures together transformed a standard product search into a disorienting and functionally fruitless exercise.

45.     These failures violate two foundational requirements of the WCAG at their most basic level of compliance. First, where a webpage contains a block of content that must be traversed before a user can reach the page's primary content, the website must provide a mechanism allowing users to bypass that block. Defendant's filter panel provides no such mechanism, in violation of WCAG 2.1 Success Criterion 2.4.1, a Level A requirement. Second, the structure and relationships conveyed visually on a webpage, including the organization of filter controls and their relationship to search results, must be programmatically determinable, meaning assistive technology must be able to read and communicate that structure accurately to the user. Defendant's unlabeled, improperly structured filter panel cannot be read accurately, because it was not built accurately, in violation of WCAG 2.1 Success Criterion 1.3.1, also a Level A requirement. Together, these failures denied Plaintiff access to the product listings that were the entire purpose of his search.

46.     Defendant's Website contains a main navigation banner spanning the top of the page. The banner is organized into primary categories, such as sections for different product lines, each of which expands to reveal a set of subcategories when accessed. For a sighted user, this structure is intuitive: the primary categories are visible across the top of the page, subcategories appear on hover or click, and the user moves between them freely by pointing and clicking. Navigation through the banner is fluid and entirely under the user's control.

47.     For a blind user navigating by keyboard and screen reader, a navigation banner must be coded so that the user can move through its contents using standard keyboard commands and, critically, can exit the banner when finished and continue to the rest of the page. The ability to leave a navigational structure is not a convenience: it is a baseline requirement. A user who can enter a section of a webpage but cannot leave it is not navigating the page. They are trapped in it.

48.     When Plaintiff accessed Defendant's navigation banner, he was able to move into its primary category sections and encounter their subcategories. However, when he attempted to move his cursor through those subcategories, the Website returned his screen reader's focus to the beginning of the navigation banner. Each time Plaintiff navigated through a subcategory, he was cycled back to the banner's starting point. He could not advance past the subcategories to continue through the banner, and he could not exit the banner to reach the page content below it. He

attempted this repeatedly. The result was the same each time: his focus reset to the beginning of the navigation structure he was trying to leave.

49.     This occurred because Defendant's navigation banner was programmed in a manner that creates a closed loop for keyboard users. A properly coded navigation structure allows a user to move through its contents using standard keyboard commands: the Tab key to advance, Shift+Tab to reverse, Escape to close an expanded submenu and return to the parent, and to exit the structure entirely when navigation is complete. Defendant's banner does not permit exit. When Plaintiff reached the subcategories within a primary section, the keyboard focus cycling behavior locked him inside the banner, overriding his attempts to move forward and returning him to the start regardless of what command he issued. The banner became a structure he could enter but not leave.

50.     The practical consequence for Plaintiff was complete. He could not access Defendant's main navigation. He could not use it to browse product categories, locate specific sections of the Website, or orient himself within the site's structure. The navigation banner that sighted visitors use to move through Defendant's Website freely and instantly was, for Plaintiff, an inescapable loop. He was forced to abandon navigation through the banner entirely, unable to use the primary tool Defendant had built for that purpose.

51.     This failure violates one of the most fundamental requirements of the WCAG at their most basic level of compliance. WCAG 2.1 Success Criterion 2.1.2 mandates that if keyboard focus can be moved to a component using a keyboard interface, focus must be able to be moved away from that component using only the keyboard. If moving focus away requires more than unmodified arrow keys or tab keys, the user must be informed of the method for doing so. Defendant's navigation banner satisfies neither condition. Focus can enter the banner. It cannot leave. No alternative method of escape is provided or announced. That is a Level A requirement—the most fundamental tier of accessibility—and Defendant's navigation banner fails it completely. Of all the barriers Plaintiff encountered on Defendant's Website, this one is among the most severe in its effect: it did not merely impede Plaintiff's navigation. It ended it.

52.     Independent automated testing of Defendant's Website, conducted using accessibility scanning tools, identified patterns of technical failure that extend beyond the individual barriers Plaintiff encountered and establish that those barriers are the product of systemic deficiencies in how the Website was built. These findings confirm that the access failures Plaintiff experienced were not isolated errors on individual pages. They are the predictable consequence of structural choices that affect the Website as a whole.

F&S Law

17

53.     The automated scan identified duplicate ID attributes across multiple pages of Defendant's Website. An ID attribute is the mechanism by which interactive elements on a webpage locate their targets: skip links use IDs to find the content they are meant to jump to; anchor links use IDs to find the sections they are meant to navigate to; ARIA labels use IDs to associate controls with their descriptions. When an ID is duplicated, the element pointing to it either lands on the wrong target or finds no target at all. This defect directly explains Plaintiff's experience with Defendant's Skip to Content button, which located and activated the control but produced no navigation — a result consistent with a skip link whose target ID either does not exist or appears more than once on the page.

54.     The automated scan further identified that Defendant's Website is built using a JavaScript rendering framework that generates and injects page content dynamically, after the initial page has loaded. Websites built on such frameworks require deliberate, affirmative programming to manage keyboard focus whenever content changes: when a dialog opens, when a menu expands, when a panel loads, or when any interactive element is added to or removed from the page. Without that deliberate programming, the framework does not manage focus at all, and the user's screen reader cursor ends up wherever the browser defaults, which bears no predictable relationship to where the user needs to be. The pop-up dialog that deposited Plaintiff's focus at the bottom of the page upon dismissal, and the

navigation banner that cycled Plaintiff's focus back to its beginning rather than permitting exit, are both consistent with a framework that is rendering content dynamically without implementing the focus management that dynamic rendering requires.

55.    The automated scan also identified multiple elements on the same page designated as the primary content region of the Website. A webpage should contain only one such region. Screen-reading software uses this landmark to orient blind users and allow them to jump directly to the page's main content. When multiple elements claim that designation, the screen reader cannot reliably identify where primary content begins, compounding the disorientation that results when other navigation mechanisms, such as a skip link, also fail to deliver the user to a known location.

56.    The automated scan further identified missing alternative text on images across multiple pages of Defendant's Website. Alternative text is the mechanism by which images are described to blind users: without it, a screen reader either skips the image entirely or reads out a raw file name that conveys nothing meaningful. On a website whose primary commercial purpose is the sale of visual products, the absence of image descriptions denies blind users access to the same product information that sighted users receive at a glance, compounding the barriers Plaintiff encountered at every stage of his attempt to browse and purchase.

57.    Taken together, these findings establish that the barriers Plaintiff encountered were not the result of overlooked details or isolated coding errors. They reflect a website whose underlying architecture was never built to manage focus, communicate structure, or present content in a manner accessible to blind users. The individual failures Plaintiff experienced: the disorienting dialog, the non-functional skip link, the unlabeled filters, the navigation trap, are each a surface manifestation of the same foundational deficiency. Defendant's Website was designed and deployed without implementing the accessibility requirements that its own technical framework demands. That failure is not incidental. It is structural.

58.    The finding of missing alt text corroborates the systemic nature of Defendant's accessibility failures and is expected to be further developed through discovery.

59.    WCAG guidelines are divided into levels of compliance: Level A (pages with Level A issues are unusable for some people); Level AA (pages with Level AA issues are very difficult to use); and Level AAA (pages with Level AAA issues can be difficult to use).

60.    Websites are generally expected to maintain compliance with WCAG 2.1 Level AA or higher to be considered accessible. Level A issues—issues that are unusable for some people—are unacceptable as they prevent proper use of a website.

61.   The WCAG 2.1 Level A issues experienced by Plaintiff prevented him from perceiving and navigating Defendant's Website in an understandable or robust way. Defendant's Website presented with errors that are unusable for some people, including Plaintiff. This was confirmed during Plaintiff's visit to Defendant's Website, as the accessibility errors prevented him from browsing or researching products or completing a purchase on Defendant's Website.

62.   The identified accessibility errors are not theoretical or technical irregularities. They are not subjectively open to interpretation. Defendant's Website presented objectively verifiable and determinable errors that violate WCAG 2.1 Level A guidelines, representing the most severe type of accessibility errors that render websites unusable.

63.   The identified WCAG 2.1 Level A violations directly interfered with Plaintiff's ability to locate, understand, and utilize the information necessary to research products and complete a purchase on Defendant's Website, thereby denying Plaintiff full and equal access to Defendant's goods and services in violation of the PWDCRA and Title III of the ADA.

64.   Plaintiff was familiar with Defendant's products before visiting the Website. Prior to the events described herein, Plaintiff had owned and used Defendant's products and wished to purchase them again. Defendant operates its Website for exactly that purpose: to allow customers to browse its offerings and

complete purchases directly online. The ability to independently return to a brand one knows and trusts, and to purchase its products on one's own terms, is something sighted customers exercise without a second thought. For Plaintiff, it required navigating Defendant's Website with a screen reader.

65.     Plaintiff was unable to complete that task. He was disoriented before he could take a single step by a pop-up dialog that deposited his focus at the bottom of the page. The skip link Defendant provided to assist users like him did not work. The filter panel he was forced to traverse was unlabeled, and after passing through it he was sent to the bottom of the page rather than to the products he was seeking. When he attempted to use Defendant's navigation banner to orient himself and locate what he was looking for, he became trapped in a loop he could not escape. He did not purchase anything. The independence he sought, the simple ability to go online and buy a product he already knew he wanted, was not available to him on Defendant's Website.

66.     The practical consequence of Defendant's inaccessible Website was not abstract. Plaintiff was denied the ability to complete a routine consumer transaction that any sighted visitor to the same Website could have completed in minutes. He could not browse Defendant's product offerings, could not locate the specific items he was seeking, and could not proceed toward purchase. The Website that Defendant

holds open to the public as its primary retail channel was, for Plaintiff, effectively closed from the moment he arrived.

67.     The dignitary harm Plaintiff suffered was equally real. Plaintiff is not a first-time visitor encountering an unfamiliar brand. He is a returning customer, someone who already knows Defendant's products, has owned them, and chose to return. The Website's failures did not merely inconvenience him. They communicated, through every disorienting displacement and every structure he could not navigate or escape, that the experience Defendant had designed was not designed for him. That message was delivered not once but repeatedly, at every stage of his attempt to do something as ordinary as repurchase a product he already trusted.

68.     Plaintiff was ultimately forced to choose between abandoning the purchase entirely or seeking sighted assistance to complete a transaction he wished to complete on his own. That choice, giving up rather than asking for help, reflects the particular indignity that inaccessible websites impose on blind users: not just the loss of a transaction, but the loss of the independence that Defendant's Website extends to every sighted customer as a matter of course. Requiring Plaintiff to depend on the assistance of another person to do what sighted customers do alone is itself a form of unequal treatment that the ADA and PWDCRA exist to prohibit.

69.     Plaintiff is a disabled individual who is interested in patronizing Defendant and intends to return to and access the Website once its access barriers

are removed or remedied. Plaintiff will continue to be denied equal access to Defendant's Website unless and until Defendant is compelled to bring the Website into compliance with applicable accessibility standards.

<u>**COUNT I – VIOLATION OF THE PWDCRA**</u>

70.    Plaintiff incorporates by reference paragraphs 1 through 68 as if fully stated herein.

71.    Plaintiff is an individual with a visual impairment that substantially limits a major life activity and qualifies as a disability within the meaning of the PWDCRA.

72.    The PWDCRA guarantees the opportunity to obtain the "full and equal utilization of public accommodations" without discrimination as a civil right. MCL 37.1102(1).

73.    A place of public accommodation means a business, educational institution, refreshment, entertainment, recreation, health, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. MCL 37.1301(a).

74.    Defendant's business is a place of public accommodation under the PWDCRA because Defendant is a business whose goods, services, facilities,

privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. MCL 37.1301(a).

75.     Defendant's Website is also a place of public accommodation under the PWDCRA because it provides the general public with the ability to locate and learn about Defendant's goods and products, provides direct-to-consumer purchasing of Defendant's goods and products, and features a Store Locator that connects consumers to the physical places of public accommodation in which Defendant's goods are sold. The Website is thus an extension of, gateway to, and an intangible "service, privilege, and advantage" of the many physical places of public accommodation at and through which Defendant's goods and products are sold. MCL 37.1302(a).

76.     The PWDCRA expressly states:

> except where permitted by law, a person shall not...deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodation of a place of public accommodation or public service because of a disability that is unrelated to the individual's ability to utilize and benefit from the goods, services, facilities, privileges, advantages, or accommodations or because of the use by an individual of adaptive devices or aids (e.g., screen-reading software). MCL 37.1302(a).

77.     Defendant's Website functions as an essential gateway to places of public accommodation because it is the primary means by which prospective customers, including Plaintiff, can access information regarding Defendant's goods

and products, discovering not only where they are sold but also providing a direct outlet to purchase the goods directly on the Website.

78.    Defendant's Website is designed, constructed, managed, operated, and/or maintained in a manner that is inaccessible to Plaintiff and other similarly situated individuals because it is not compatible with commonly used screen-reader software. The accessibility errors on Defendant's Website make the goods and products offered therein unavailable to Plaintiff.

79.    Defendant's Website contains specific, remediable barriers that contravene widely recognized accessibility standards as identified in detail above. The accessibility barriers directly denied Plaintiff the full and equal enjoyment of Defendant's goods and products by materially burdening tasks that sighted users can perform routinely.

80.    Plaintiff attempted to use Defendant's Website on February 10, 2026. Because of the accessibility errors described in detail above, Plaintiff was precluded from browsing Defendant's products or completing an order on Defendant's Website based on his disability. This constituted an unlawful denial of equal access to Defendant's goods and products.

81.    As a direct and proximate result of Defendant's unlawful denial of equal access, Plaintiff has been denied the full and equal enjoyment of Defendant's goods and products. Plaintiff has suffered and continues to suffer both economic and

F&S Law

dignitary harms. Plaintiff was unable to independently complete an order on Defendant's Website, forcing Plaintiff to either abandon the purchase entirely or surrender the independence that Defendant's Website extends to sighted customers. As a result, Plaintiff experienced significant emotional distress, frustration, humiliation, embarrassment, and a deepened sense of social exclusion. Defendant's refusal to provide an accessible website has reinforced and exacerbated Plaintiff's sense of segregation and exclusion, intensifying the dignitary harms flowing from his disability.

82.     The PWDCRA applies to all aspects of the provision of goods and services by a place of public accommodation, including the use of digital platforms when those digital platforms are directly connected to the corresponding physical facilities and are essential to accessing and utilizing the facilities' services.

83.     Plaintiff is entitled to monetary relief for emotional injuries and reasonable attorney's fees under MCL 37.1606 as a result of Defendant's denial of equal access.

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A. Damages for the dignitary harms, emotional distress, frustration, humiliation, embarrassment, loss of independence, and exacerbated feelings of segregation and exclusion Plaintiff has suffered and continues to suffer as a direct result of Defendant's unlawful denial of equal access;

27

B. An award of reasonable attorney fees, costs, and litigation expenses;

C. Pre- and post-judgment interest;

D. Any other relief as the Court deems fair and just.

## COUNT II – VIOLATION OF THE ADA

84.     Plaintiff incorporates by reference paragraphs 1 through 82 as if fully stated herein.

85.     The Americans with Disabilities Act of 1990 ("ADA") identifies a wide range of businesses as public accommodations, including retail establishments and other locations where consumer goods are offered for sale, including a "grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment[s]." 42 U.S.C. § 12181(7)(E).

86.     Defendant is subject to the accessibility requirements of the ADA because Defendant has placed and sells its goods in retail establishments and profits from the general public.

87.     Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

F&S Law

88.   Defendant's Website is covered under Title III of the ADA because it provides the general public with the ability to locate and learn about the physical places of business at and through which Defendant's goods and products are sold. The Website is an extension of, gateway to, and intangible "service, privilege, and advantage" of the same physical locations, and is therefore a covered service of a place of public accommodation under 42 U.S.C. § 12182(a).

89.   Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that are equal to the opportunities afforded to other non-disabled individuals.

90.   Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

91.   In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps,

as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden."

92.    Defendant's non-compliant Website denies blind and visually impaired individuals full and equal access to, and enjoyment of, the goods, information, and services that Defendant has made available to the public on the Website and in the physical locations in which its goods are sold in violation of 42 U.S.C. §12101, *et seq*, and as prohibited by 42 U.S.C. §12182, et seq.

93.    Defendant has made insufficient material changes or improvements to the Website to enable its full and equal use and enjoyment by, and accessibility to, blind and visually disabled persons such as Plaintiff.

94.    Violations may be present and on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

95.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other business entities in making their websites accessible. Incorporating basic accessibility improvements as described in WCAG 2.1 AA

would neither fundamentally alter the nature of Defendant's business nor would they result in an undue burden on Defendant.

96.     Defendant's Website is substantially noncompliant with internationally accepted guidelines regarding digital accessibility and, as a result, fails to be perceivable, operable, understandable, robust—the four foundational principles of the WCAG—and is therefore accessible by blind and/or visually disabled individuals such as Plaintiff.

97.     Defendant has and continues to violate the ADA by denying access to the Website by individuals such as Plaintiff with visual disabilities who require the assistance of screen reader software to comprehend and access internet websites. The violations within the Website are ongoing.

98.     Part 36 of Title 28 of the C.F.R. was designed and implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the accessibility standards established by Part 36.

99.     Defendant's Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication and thus violates the ADA.

F&S Law

100. Regulatory guidance confirms that Title III specifically requires that places of public accommodation provide effective communication via auxiliary aids and services to individuals with disabilities. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems."

101. 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

102. Public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities: "In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

103. As a direct and proximate result of Defendant's failure to provide an ADA-compliant Website with a nexus to the places of public accommodation in which its goods are sold, Plaintiff has suffered an injury-in-fact by being denied full and equal access to, and enjoyment of, Defendant's Website and the corresponding physical facilities. Plaintiff has experienced dignitary and emotional harms, including frustration, humiliation, and loss of independence. Because of the inadequate development and administration of the Website, Plaintiff is entitled to

F&S Law

injunctive relief pursuant to 42 U.S.C. §12133 to remedy the ongoing disability discrimination.

104.   This Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief.

105.   Plaintiff is entitled to recover his reasonable attorney's fees, costs, and expenses pursuant to the ADA.

WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendant for the following relief:

a. A permanent injunction to prohibit Defendant from violating the Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq.;

b. A permanent injunction requiring Defendant to take the steps necessary to make its Website fully compliant with the requirements set forth in the ADA and its implementing regulations, so that the Website is readily accessible to and usable by blind individuals;

c. An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

d. Such other and further relief as this Court deems fair and just.

March 6, 2026

/s/ William R. Frush
F&S LAW, PLLC
77 Monroe Center St. NW Suite 600
Grand Rapids, MI 49503
(248) 675-9192
wfrush@fslawpllc.com
P87016